J. H. FREDERICH v. UNION ELECTRIC LIGHT & POWER COMPANY, a Corporation, Appellant.—82 S. W. (2d) 79.

Division One, April 17, 1935.

*Edgar Shook* for appellant; *Baker, Botts, Andrews & Wharton* of counsel.

*C. O. French* for respondent.

HYDE, C.—This case, coming recently to the writer, is an action in equity for specific performance. To establish the contract sought to be enforced, plaintiff relied upon a letter from defendant and his acceptance of the offer therein, by telegram. Defendant's defense was that, by mistake, the description of the land in the letter was incomplete, and that part of the land intended to be covered by the offer was not described therein. Defendant also filed a cross bill seeking a decree of cancellation, declaring that no contract existed for the land described in plaintiff's petition. The court found that there was an offer and acceptance by the letter and telegram which constituted a valid and binding contract and decreed specific performance thereof, requiring defendant to pay to plaintiff the sum of $12,000 with interest at six per cent from the date of his telegram, upon execution and delivery of a deed from plaintiff conveying to defendant a perpetual easement for inundation of the tract of land described in the decree as containing 10.8 acres. Defendant has appealed from this decree.

Plaintiff owned 360 acres of land in Benton County described as the southeast quarter of the northwest quarter, and the south half of section 20, township 40, range 21. This farm was located on Turkey Creek, a stream running into the Osage River from the south, and will be referred to as the Turkey Creek farm. Plaintiff also owned two farms in township 40 of range 20 about six miles northeast of the Turkey Creek farm on the north bank of the Osage River. These two farms will be referred to as the Osage River farms. Plaintiff also had some interest in another farm on the north bank of the Osage River, the title of which was held in the name of a man named Owsley. This will be referred to as the Owsley farm. All of these farms were to some extent subject to overflow by reason of the defendant's project known as the Bagnell Dam creating the Lake of the Ozarks. Plaintiff also owned other land not on the lake, either individually or with others, amounting altogether to more than 4,000 acres. He was a lifelong resident of that section and had been in the business of buying and selling land for many years.

In 1929, it was established by surveys that the normal level of the lake when full would be 660 feet above sea level. It was also determined that at times of flood, the lake could reach a level of 673 feet. Surveys were made along the Osage River and its tributaries, and stakes set marking the limits of these two contour lines. The 660-foot contour did not reach the Turkey Creek farm. The 673-foot contour came almost to the south line of the west eighty of the

Turkey Creek farm, but followed closely the creek banks except on the north side, where it widened out on the east bank of the creek commencing about half way across the northwest forty and also took in a strip running from the north line of this forty southeast beyond the center of the same, as shown by the following plat of section 20, to-wit:

The highest estimate made of plaintiff's land included within this 673-foot contour line was 13.9 acres. It was, as noted, stated in the court's decree to be 10.8 acres. The amount of plaintiff's land in Turkey Creek bottom was estimated by the witnesses at from 50 to 70 acres. The rest of the farm was rough, hilly land. It appears that the lake would cover approximately 128 acres of the river farms. The lake also covered part of the Owsley farm, but the acreage to be overflowed there was not shown. A resort development was under way on the Owsley farm known as Lakeview Heights; lots had been

1044

laid out, and were being sold during the year 1930. During 1929 and 1930, plaintiff was employed by pipe line companies securing rights of way on their pipe lines and was away from his home in Benton County a considerable part of both years. When plaintiff was at home, defendant's land buyers negotiated with him to purchase the right or easement to overflow the land on his farms necessary for the lake. According to plaintiff, the first land buyer who came to see him was a Mr. Hughes who had died before the trial. This was in the fall of 1929. Soon after Mr. Hughes' visit, Mr. Hughes' son came to see him. He represented the St. Louis Federal Land Bank, which held a mortgage on the Turkey Creek farm, made originally for $4000, but was reduced by semi-annual payments to $3295.28 by the time of the trial. At that time, two semi-annual payments to the land bank were delinquent and Mr. Hughes asked plaintiff to deed the farm to the land bank in settlement of the mortgage. Plaintiff refused to do this and Mr. Hughes advised him he had better sell the easement to pay the Land Bank. Plaintiff said that Mr. Hughes told him he thought he could get $2000 and said that "the water wouldn't hardly go on it—that it would go up the sloughs about one or one and one-half acres." Plaintiff said that Mr. Hughes finally said that he might get $4000 and that he told him "I would have to have at least that to pay the bank and relieve me." Plaintiff said that at that time he had been to the farm to see where the stakes were. Hughes denied that he told plaintiff he could get either amount. He placed the reasonable market value of the whole farm at $4000.

Plaintiff related subsequent developments as follows:

"I went down shortly to see about the stakes to see if they just came up the sloughs and where the creeks were and they were clear across the farm within some thirty yards of the south line within thirty-three steps. . . . He (Hughes) came to see me several times and after that I went to see the stakes. The next time there was some land man with him . . . wanted to know if I would take $4,000.00. . . . I told him after I had seen the stakes that it would ruin the farm and that farm had cost me $12,600.00 and I had to pay for that farm. . . . I told them I would not take less than $12,600.00." (Hughes also denied that this amount was mentioned as damages.)

As to the damage to the farm, plaintiff testified as follows:

"Q. How many acres are there below the stakes that you would be able to cultivate? A. 12 or 13 acres, but it ruins the entire bottom land. . . . Q. There are 12 or 13 acres below the stakes —how much of that is tillable land outside of the creek bed? A. One-half of it. There are some sloughs and they come up to a point and it is fairly high to the center. . . . Q. Will you state to the court within those lines how much of the land is tillable land?

A. Six or six and one-half acres, if you take the brush off.''

During the first part of 1930, other land buyers came to see plaintiff and their testimony was that they offered him $1000 for the easement on the Turkey Creek farm and that he offered to take $4000 for it. Plaintiff denied that any offer of $1000 was ever made him or that he ever talked to anyone about taking $4000 for it, except as above stated to Mr. Hughes before he saw the stakes on the land, and that after he had seen them he told Mr. Hughes and the others that he would consider nothing less than $12,600 for the easement they wanted on the Turkey Creek farm. Other land buyers had talked to him about the Osage River farms and because he was leaving about the latter part of June, 1930, to work in Ohio for the pipe line company, he asked them to see what could be done before he left. Land buyers Simms and Phillips came to see him in June and talked about a price that would include the Turkey Creek farm and the Osage River farms. He said that he stated to them: ''I would have to have something like $50,000.00 for the four tracts. (Evidently four tracts would include the Owsley farm.) . . . They said they thought $50,000.00 was too high and·I considered the matter and I wanted to get the deal closed up and get away and I told them I would take $35,000.00, but they wouldn't deal on that. They would·not make me any offer, they just said that $35,-000.00 was too high and $50,000.00 was too high and that was substantially all the conversation.''

After this failure to make a deal in June, plaintiff went to work in Ohio for the pipe line company and did not return to Missouri until December. It was shown that Mr. Gehrean was in charge of defendant's land buyers with offices at Warsaw and Versailles, and that, when there was a failure to buy land in any case, Mr. Dean in defendant's office in Kansas City took the first step for condemnation proceedings by making a final offer to the owner. For this purpose, it was Mr. Gehrean's duty to report to Mr. Dean the cases in which it became necessary to condemn and to give him the information about what kind of a final offer to make. Mr. Dean would then have the company's attorney, Mr. Sandison, prepare a form letter for this purpose, addressed to the persons shown by the abstracts to have an interest in the land, and he then filled in the amount of the offer and signed and mailed the letter.

On October 17, 1930, Mr. Gehrean wrote Mr. Dean as follows:

''It will be necessary to condemn the J. H. Frederich property, which is described as: S½ of Sec. 20 and SE¼ of NW¼ of Sec. 20, Twp. 40, Range 21. There will be about 128 acres of this inundated and he is asking $25,000.00. He is a promoter and there is no chance to deal with him. This is a place where they are making developments and they are now selling lots. This place which they are developing is known as 'Lakeview Heights.' ''

The land described in this letter was the Turkey Creek farm only. This letter in no way referred to the land it described, because there was not 128 acres which could have been inundated on the Turkey Creek farm (actually only about one-tenth of that amount, at the highest flood level of the lake).; plaintiff never claimed to have asked $25,000 for the Turkey Creek farm; and Lakeview Heights was located on the Owsley farm. After receipt of this letter and further information by telephone as to the amount to offer to plaintiff, Mr. Dean had Mr. Sandison prepare a letter to plaintiff based upon the examination of the abstract to the land described in Mr. Gehrean's letter, the Turkey Creek farm only.

This letter, dated November 11, 1930, sent to plaintiff's home address, was forwarded to him in Ohio and read as follows:

"It appears that you and the heirs and widow of B. P. Johnson are owners of the SE¼ of the NW¼ and the South half of Section 20, Township 40, Range 21, Benton County, Missouri. A portion of this land, as shown by stakes set upon it by the engineering party, will be required for purposes incident to the construction of the Osage Dam and Power Project on the Osage River near Bagnell, Missouri, being constructed by this Company. Since it has been impossible to arrive at an agreement for the purchase of this land, Union Electric Light and Power Company now offers you for the interests of yourself and certain other owners, the sum of Twelve Thousand Dollars ($12,000.00) as damages by reason of the appropriation of the portion of said land required. If we do not have an acceptance from you by November 18, we shall understand that this offer is rejected."

Plaintiff, on November 18, 1930, sent from Harrison, Ohio, the following telegram: "I accept your offer of twelve thousand dollars for easement on my three hundred sixty acres Turkey Creek farm as made in your letter of November eleventh last." Defendant, also on the same day, wrote the following letter to Mr. Dean:

"Your letter of November 11th reached me here the 15th and I immediately wired the Federal Land Bank of Saint Louis to assist me in handling the matters referred to in your letter. They have kindly consented to do this and I am wiring you today as follows: 'I accept your offer of Twelve Thousand Dollars for easement on my three hundred sixty acre Turkey Creek farm as made in your letter November eleventh last.' I am enclosing herewith copy of my letter to the Federal Land Bank and you may take up the details with them. If there is anything further I can do in the matter please advise."

Apparently Mr. Dean did not discover his error until after November 21, 1930, when Mr. Gehrean wrote another letter to Mr. Dean, as follows:

"The following described property belongs to J. H. Frederich:

"The Northeast quarter L.B.O.R., the South half of the Northwest quarter L.B.O.R., and the Southeast quarter L.B.O.R., Section 8; the Northwest quarter of the Southwest quarter of Section 9; the West half of the Northwest quarter and the Southwest quarter L.B.O.R., Section 14, all in Township 40, Range 20, containing 475.87 acres more or less.

"There will be 128.87 acres inundated. We bid $12,000.00 for Easement on part of land we needed, he ask $35,000.00 for Easement. There is no chance to deal. I believe it will be well to proceed with condemnation at once. The final offer on this tract should be $12,-000.00 for Easement. Mr. Frederich owns another farm described as: The South half and the Southeast quarter of the Northwest quarter of Section 20-40-21, which we ask condemnation on October 17. The attorneys have the abstract on this property here in the office now. The final offer on this tract should be $1000.00, making a final offer on all $13,000.00."

Just before this letter was received the abstracts to the Osage River farms had come in. Thereafter, on November 24, a copy of the attorney's opinion on these abstracts was sent to plaintiff, stating the defects in the title, and plaintiff was notified that it was his duty under his contract to have these requirements fulfilled. Plaintiff replied to this by a letter dated December 8, 1930, as follows:

"Your letter dated November 24th, 1930, in which you say you are sending requirements necessary to perfect title to land on which I sold an easement to The Union Electric Co. reached me here after being forwarded several times. The land on which I sold the easement is the southeast quarter of the northwest quarter and the south half of Sec. 20, Twp. 40, Range 21, Benton County, Missouri, as described in a letter dated November 11th, 1930, in which Mr. D. A. Dean made me the offer and which I accepted by telegram November 18th, 1930. The Federal Land Bank of Saint Louis holds a loan on this place and they have consented to handle the details in this transaction for me inasmuch as I am away from home temporarily. I do not know just how far this deal has progressed but I expect to be home about the 15th of this month and I will be glad to do what I can toward perfecting the title."

Mr. Dean replied to this letter December 22, 1930, as follows:

"We are in receipt of your letter of December 8th in which you state that the land on which you sold the easement to the Union Electric Company was the SE¼ of the NW¼ and the S½ of Section 20, Township 40, Range 21, Benton County, Missouri. In this you are in error and we hereby notify you that said offer of $12,000.00 was on all of the following described land; SE¼ of the NW¼ and the S½ of Section 20, Township 40, Range 21; SE fractional quarter lying North of the Osage River of Section 8 and the NW¼ of the SW¼ of

Section 9, and the SW fractional quarter L.B.O.R., and the W½ of the NW¼ of Section 14, and the East 35 acres of the NW¼ of Section 15, all in Township 40, Range 20, Benton County, Missouri. We assume, of course, that you understand that this is the offer because of the oral negotiations heretofore had by you with representatives of the Union Electric Company on this basis. We assume, also, that it is your intention to close this transaction on the basis of the payment of $12,000.00 to you for an easement on all of said last above described lands and would be glad to have a confirmation from you to this effect. In order that this matter may be satisfactorily and speedily cleared up, will you, if you have any misunderstanding about this, please advise us what your price is for an easement on all the above described land, said easement on all of said land to include that portion which is now marked out by stakes on the ground, including, as we understand it, approximately one hundred twenty acres. We shall appreciate a prompt reply from you.''

Plaintiff did not reply to this letter but came to Kansas City, where he had a conversation about the matter with Mr. Dean and Mr. Sandison. Dean said that plaintiff told them that ''he had taken it up with his lawyer,'' and ''he wouldn't admit anything.'' According to Sandison, plaintiff said: ''I am just going to keep whatever I got.''

Plaintiff related this conversation as follows:

''He (Dean) said he had made an error in regard to his letter in which he made the offer and he wanted to know what I thought about going through with it and he wanted to know about it, but they didn't want me to take advantage of a mistake, and I told him I didn't expect to do that but I didn't feel there was any mistake. He said the offer of $12,000.00 was supposed to have been for all the land involved and on that basis. I told him I thought that was fair, $12,000.00 on this farm and $23,000.00 on the other farms and I told him if he would come down and look at them himself he would agree with me. He thought the price was too high. (Plaintiff said he still offered to take $35,000.00 for easements on all of his land.) . . . Q. Didn't he (Mr. Sandison) make a statement in your hearing at that time that the letter was a mistake? A. He said he didn't think this letter would constitute a contract after Mr. Dean said what he did. Q. Now then, isn't it also a fact that you, at that time, said in regard to the ways of business, 'that when a mistake was made you just got hooked, that was all?' A. I told them I made a certain price in a mistake in Indiana for right of way and I had to send a man to Pennsylvania to make good that offer Q. You didn't say it was just too bad now that the offer was made? A. I told him I wasn't his guardian. Q. Didn't you say that you knew this letter of November 11th, was a mistake on the part of the company and Mr. Dean? A. I didn't know. I thought

it was fair to get $12,000.00 and I sent a telegram and accepted the offer.''

Plaintiff attempted to justify a $12,000 price, as follows:

''Q. How did you arrive at this price of $12,600.00 on this Turkey Creek farm? A. The farm, I considered was practically ruined and the farm cost me that and I thought I should have that for it. Q. There are about 360 acres in that farm? A. Seventy acres in the bottom and the rest is hill land. Q. And there were twelve or thirteen acres below the stakes? A. I couldn't rent it this year on account of the watermarks. Yes, sir. Q. How did you arrive at this figure of $12,600? A. It ruined the farm. Q. How did you arrive at the figure? A. That was what it cost me. Q. That wasn't what you could have sold it for? A. No, sir, I don't suppose I could sell it for that.''

No settlement of the matter having been made defendant commenced condemnation of the Osage River farms and plaintiff commenced this suit. Plaintiff received $33,765 as damages to his other land, $25,765 of which was for the two river farms. Defendant introduced evidence as to the value of the Turkey Creek farm showing that the reasonable market value of the bottom land was $50 per acre and of the hill land $10 per acre. It also had considerable evidence that the land was worth even less than that, some witnesses placing the value of the hill land as low as $5 per acre, and there were witnesses who placed the value of the land below the 673-foot contour line at from $200 to $400. Mr. Gregory, one of defendant's land buyers who formerly owned the Turkey Creek farm, testified that he traded it to plaintiff and another man in 1921, with $5500 against it, for $1650 in implements. Plaintiff did not deny that this was his original trade for the equity in the farm (he claimed it had encumbrances of $8100, but whether he meant the first or second time he got it is not clear); and he did say that he and another man got it from Mr. Gregory but did not explain the consideration. Plaintiff said that they traded it to another man and later got it back. To prove his title, plaintiff offered two deeds: One from J. L. Stanford and wife dated July 31, 1922, which recited a consideration of one dollar and exchange of property; the other from J. H. Garrison, single, dated November 10, 1923, which recited one dollar and other valuable consideration. He said: ' ''We both had an equity in it together and in 1929 we divided that property and it cost me $35.00 per acre and he took the Deer Creek farm and I have spent a great deal of money on it since that time.'' Plaintiff further stated that in his opinion the fair market value of the land in 1930 was $50 per acre. However, it was shown that the buildings on the farm were of little value, and plaintiff did not attempt to explain the expenditures upon which he based either his $35 per acre cost or his $50 per acre valuation.

It was shown that the market value of land in that part of the State in 1930 was from twenty per cent to fifty per cent less than it had been a few days before. It is, of course, common knowledge that farm land has consistently declined to lower levels of value throughout the whole middle west during all of the period from 1920 to 1930.

Plaintiff made no attempt to show, either that he had acquired the interest of the heirs and widow of B. P. Johnson, by quitclaim deed or otherwise, or to show that they had no interest. Defendant's offer clearly covered their interest, whatever it was, as well as plaintiff's, and defendant's answer alleged lack of title. This issue of ability to convey the Johnson interests was ignored by plaintiff, who offered only the two deeds, made in 1922 and 1923 by parties other than the Johnsons, and possession which was not very definitely shown to cover the full statutory period. However, there is something even more fundamentally wrong with plaintiff's case than this.

■ There can be no doubt that defendant's November eleventh letter of offer was the result of a mistake. This is clearly shown by documentary evidence, the letters from defendant's field agent in charge of land buying to Mr. Dean in its Kansas City office, and there is nothing to dispute their genuineness. Obviously, Dean must have thought the land described in his letter was either the Osage River farms or the Owsley farm or all of plaintiff's farms. It is true that, while in an equity case this court may weigh the evidence, we usually defer to the findings of the chancellor as to matters which depend upon conflicting oral testimony of witnesses who appeared before him. However, here, not only is there documentary evidence of a material mistake, which is unimpeached, but it is so strongly corroborated by all the testimony, even including that of plaintiff himself, as to be almost conclusive. Moreover, the chancellor made no specific finding as to material facts, but instead, made what amounts to a general ruling of law "that said offer and acceptance constituted a valid and binding contract." In view of the facts, we cannot uphold this ruling. Taking the highest valuation ($50 per acre) put on the Turkey Creek farm by plaintiff, it cannot, even without the plain documentary evidence of the mistake and how it occurred, reasonably be considered that defendant intended to offer $12,000 for the easement of intermittently flooding a maximum tract of twelve or thirteen acres, or that anyone could reasonably think so. The Turkey Creek farm at that valuation (high in view of its cost and other circumstances) figures a total of $18,000. Even if the bottom land (about one-sixth of the farm in area) was worth as much as the all remaining land (which conclusion evidence favorable to plaintiff would justify), its value would only be $9000, and the easement sought to be acquired covered only about one-fifth of this bottom land (one-fifth of $9000 is only $1800). Even this disregards the fact that half of the land to be flooded was in

the creek or in sloughs. Plaintiff's own claim is only that the farm cost him $12,600, and he admitted that it could not have been sold for that much, yet he seeks to justify, as seeming reasonable to him, an offer to pay the amount, which, he says, the whole farm cost him, for an easement covering about one-thirtieth of its total area, only half of which, at his highest estimate, was even tillable land. A price of one thousand dollars per acre for an easement on such land, only half of which was tillable and part of that in brush, is so absurd and beyond all reason, that any contention that it was intended surely cannot be given serious consideration.

It seems very plain that plaintiff must have realized this. We cannot believe, under this evidence, that it was possible for him not to know it. He knew that defendant had refused his offer of less than three times as much for completely flooding ten times as much land on his Osage River farms, with a part of the Owsley Lakeside Heights development tract, and also this easement on the Turkey Creek farm included. His attitude is demonstrated by his own statements that he told Dean that he "wasn't his guardian;" that "he thought it was fair to get $12,000" so he "sent a telegram and accepted the offer;" and that, while working for the pipe line company, he had "made a certain price in a mistake" and had "to make good that offer." It is also shown by his offer to take $23,000 for the remaining tracts (so as to still get $35,000 for all) because, if it could possibly have been worth $12,000 to intermittently flood twelve acres, it would certainly be worth much more than twice as much to completely flood ten times that much land.

Plaintiff does not claim to have changed his position in any way before he was notified of defendant's mistake or to have suffered any loss because it made such an offer. We fail to see how he can have any standing in a court of equity to enforce a contract which it is clear that defendant did not intend to make. Relief is granted in equity only to one who can "show his own good faith and the equities of his own position." [Monticello Building Corp. v. Monticello Investment Co., 330 Mo. 1128, 52 S. W. (2d) 545.] "Equity sometimes relieves one of the consequences of his unfortunate blunder, but it never aids another to take an unfair advantage of it." [Hayden v. Lauffenburger, 157 Mo. 88, l. c. 95, 57 S. W. 721.] An unconscionable contract cannot appeal to a court of conscience. The rule is that "he who seeks equity must be willing to do equity and to have equity done to him." Specific performance is not a matter of strict right, but rests in the sound discretion of the court, which "must be exercised in view of the particular facts of each case." It is well settled that "a court of equity is never compelled to render an inequitable decree, however plain and valid may be the contract sued on;" that "specific performance of a contract will be denied in any case where such a decree would be

1052

inequitable under all the circumstances;" and that "it may be denied even when no fraud or mistake appears, where to grant it would inflict such a burden or hardship on the defendant as would be inequitable and unjust." [Rockhill Tennis Club v. Volker, 331 Mo. 947, 56 S. W. (2d) 9.] Unilateral mistake of fact is a well recognized ground for denial of specific performance. [6 R. C. L. 623, sec. 42; 25 R. C. L. 241, sec. 44; 58 C. J. 961, sec. 143; Webster v. Cecil, 30 Bevan, 62; 6 Eng. Ruling Cas. 225, note citing many cases; 65 A. L. R. 7, note, as to mistake see l. c. 97-102; 15 L. R. A. (N. S.) 81 note; 13 Ann. Cas. 1149 note; 12 Ann. Cas. 122 note; Rushton v. Thompson, 35 Fed. 635; Pope Mfg. Co. v. Gormully, 144 U. S. 238, 12 Sup. Ct. 632, 36 L. Ed. 414; Moffett, Hodgkins & Clarke Co. v. Rochester, 178 U. S. 373, 20 Sup. Ct. 957, 44 L. Ed. 1108; Coppage v. Equitable Guarantee & Trust Co. (Del.), 102 Atl. 788; Mansell v. Lord Lumber & Fuel Co. (Ill.), 180 N. E. 774; Diffenderffer v. Knoche (Md.), 84 Atl. 416; Samuel v. Cityco Realty Co. (Md.), 118 Atl. 124; Mansfield v. Sherman (Me.), 17 Atl. 300; Jasper County Electric Ry. Co. v. Curtis, 154 Mo. 10, 55 S. W. 222; Pomeroy's Specific Performance of Contracts (3 Ed.), p. 592, sec. 245; Fry on Specific Performance (5 Ed.), p. 373, chap. XV; 2 Pomeroy's Equity Jurisprudence (4 Ed.), secs. 852-863; Kerr on Fraud and Mistake, p. 411.] We hold that plaintiff has wholly failed to show that he is entitled to a decree of specific performance.

We also think that defendant is entitled to a decree of cancellation as prayed for by its cross bill. Reformation, and ordinarily rescission or cancellation, is only granted where there is a mutual mistake. However, there are exceptions made to these general rules in cases where the mistake of one party is either known to the other party or is so obvious, under the circumstances, that it must have been known to him, and the mistake concerns a matter so vital that it can be said that the parties, because of miscalculation or false information, never actually agreed to the same proposition. The rule applicable to this kind of a case is stated in 6 Ruling Case Law, 623, section 42, as follows:

"If one of the parties, through mistake, names a consideration that is out of all proportion to the value of the subject of negotiation, and the other party, realizing that a mistake must have been committed, takes advantage of it, and refuses to let the mistake be corrected when it is discovered, he cannot, under these conditions, claim an enforceable contract. Where there is a mistake that on its face is so palpable as to place a person of reasonable intelligence upon his guard, there is not a meeting of the minds of the parties, and consequently there can be no contract."

Likewise, in 9 Corpus Juris, 1167, section 18, it is stated:

"Where a contract in writing is executed by only one of the parties, under a mistake as to a fact which is of the essence of the contract, the mistake constitutes a ground for a court of equity to rescind and cancel the apparent contract as written, and to place the parties *in statu quo;* but it does not constitute a ground for reformation, the reason being that, by the mistake of one of the parties, there was no mutual assent to all the terms of the contract—no meeting of the minds—and hence there is no prior contract to which the writing may be made to conform." (However, as to reformation under certain conditions, see Pomeroy's Specific Performance, secs. 255-266.)

Authorities, which sustain these statements, are Geremia v. Boyarsky (Conn.), 140 Atl. 749; Hudson Structural Steel Co. v. Smith & Rumery Co. (Me.), 85 Atl. 384, 43 L. R. A. (N. S.) 654, note; St. Nicholas Church v. Kropp (Minn.), 160 N. W. 500, L. R. A. 1917D, 741, note; Brown v. Bradley (Tex.), 259 S. W. 676; Speers v. Lucas, 221 Mo. App. 414, 279 S. W. 736; Kerr on Fraud and Mistake, 436-438; 1 Black on Rescission and Cancellation, 401, sec. 130; 3 Williston on Contracts, 2785-2797, secs. 1573-1580, see also sec. 1557. One cannot, of course, have rescission merely because he finds that, in the light of changed conditions, he made a bad deal. [See Krueger v. Licklider (Mo.); 76 S. W. (2d) 113.] The mistake in the offer in this case was shown by clear, cogent and convincing evidence to have left out the really substantial object of the negotiations, namely, an easement to flood ten times as much land as there was on the farm described. Defendant acted soon enough that no third parties became involved and it was such a palpable mistake (three times as much as even plaintiff claimed that anyone told him he could get) that plaintiff must have recognized it as such. Plaintiff still has the right to obtain in a proper proceeding whatever damages have resulted to his land from the building of the dam. He can lose nothing but the opportunity to take advantage of defendant's agents' serious blunder in misdescribing the land.

The judgment is reversed and remanded with directions to dismiss plaintiff's bill and to enter a decree of cancellation as prayed in defendant's cross bill. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Coles, J.,* not sitting.