Lawrence W. KING, Vera H. King, Jerry L. Short, and Jacqueline F. Short, Respondents,

v.

FACTORY DIRECT, INC., Appellant.

No. 32926.

Missouri Court of Appeals, Western District.

Sept. 7, 1982.

Kelley D. Sears, Stubbs & Mann, P. C., Kansas City, for appellant.

Ronald P. Zolotor, Excelsior Springs, for respondents.

Before CLARK, P. J., and MANFORD and KENNEDY, JJ.

MANFORD, Judge.

This is an equity action for reformation of a deed tried to the court. The judgment is affirmed.

Appellant presents two points which in summary allege the following error by the trial court: (1) the judgment was against the weight of the evidence in that it was not so clear and convincing that a mistake in the deed occurred or if a mistake did occur that the mistake was mutual, and (2) the judgment should not have been entered even if a mutual mistake did occur because the mistake went to the very subject matter of the contract and deed.

The record reveals the following pertinent facts. The disputed tract of land is located in Excelsior Springs, Clay County, Missouri. Appellant is the buyer/grantee and a Missouri corporation. Respondents are sellers/grantors and individuals. On June 1, 1978, a lease was entered into between respondents' predecessor in title, Kings Maid-Rite Inc., as lessor, and appellant as lessee. The premises subject to the lease were described as:

"The uppermost floor of the building located at 1728 Jesse James Road, Excelsior Springs, Clay County, Missouri, which has dimensions of approximately 60 feet by 125 feet and which was formerly occupied by the business known as 'Don's Pharmacy', together with the parking facilities on the East side of said building for a distance of 40 feet from the East side of said building."

The lease term was for one year and contained a purchase option which reads as follows:

"... the sole and exclusive option and the right of purchase of the store building leased herein, as well as all of its appurtenances and parking facilities which property is commonly described as: 1728 Jesse James Road, Excelsior Springs, Missouri, and legally described as follows." [1]

Although a legal description was referenced in the above paragraph of the lease, the lease document fails to reveal any such description. Nor did the lease document contain footage or dimensions concerning the land accompanying the building. The record reveals that the lease was prepared by the Secretary/Attorney for appellant.

Respondents acquired ownership of the land after the lease was executed. Appellant's evidence claimed delivery of a survey of the land by respondents (referred to as the Evans Survey) in the fall of 1978. Respondents claimed the Evans Survey was never discussed with appellant. In the spring of 1979, (exact date not specified), appellant exercised its purchase option. Respondents testified that near June 1, 1979, they ordered a survey of the property. This survey (referred to as the McClarnon Survey) resulted from respondents and the surveyor going upon the land. The McClarnon Survey found 51.9 frontage feet on Kearney Road as compared with the Evans Survey which showed 100 frontage feet on Kearney Road. Respondents explained the footage difference as resulting from respondents desire to "square" his properties adjacent to and with the disputed tract. The McClarnon Survey was dated June 7, 1979. On June 4, 1979, respondents contacted their attorney, who, in turn, prepared a real estate sales contract. Although this contract did not contain a legal description, the description based upon the McClarnon survey was attached to the contract as "Exhibit A". Respondents testified that, upon delivery of the contract to appellant for execution, "Exhibit A" was affixed to the contract. Appellant's witnesses testified that they could not recall whether it was affixed

or not. In the body of the contract, the footage of the tract was defined and provided: ".... said property having a frontage of one hundred feet (100') on Highway 69, and fifty feet (50'), more or less, on Kearney Road...."

Respondents testified that, after the McClarnon Survey, but prior to the execution of the sales contract, respondents and one Griggs (a representative of appellant) went upon the tract, discussed and pointed out the boundary lines to Griggs, as per the McClarnon Survey. Griggs denied this meeting ever occurred. Respondent testified that they received and delivered copies of the McClarnon Survey to Griggs on June 7th or 8th, 1979.

The record shows the sales contract was executed under the date of June 27, 1979. One Barbara Garvin of the Excelsior Abstract and Title Company testified that respondents ordered a title policy on June 26, 1979. Garvin advised respondents she would need the property survey and the contract. At this point, respondents had neither the McClarnon Survey nor the contract, but did leave the Evans Survey with Garvin. Respondents testified to instructing Garvin that, although the Evans Survey showed more land than was being sold to appellant, the Evans Survey could be used to get the title report started. On June 28, 1979, respondents delivered the McClarnon Survey and the contract to Garvin, but did not pick up the Evans Survey. Garvin testified that through error in the title office, the Evans Survey and not the McClarnon Survey was used as the source of the legal description for the warranty deed. Garvin testified: "The girl that typed the preliminary title report picked up the Evans Survey instead of the new survey and I did not catch the mistake". Garvin also testified, ".... the warranty deed contained more land than the real estate contract".

In addition to its use in the warranty deed, the "Evans" legal description was used in all other documents. The appropriate documents, i.e., the deed and deed of

---

1. It is noted the description set forth in the lease is the same contained within the subsequently executed sales contract and appellant does not dispute this point.

trust, were duly recorded and it appeared the matter was concluded. Respondents later requested counsel for the title company [2] to do other legal work which involved other properties near the property in dispute herein. In doing this later work, Garvin observed that the deed previously delivered to appellant contained the description in the Evans Survey. She advised respondents of this in mid-October 1979.

Respondents testified that some two months following the delivery of the deed, but prior to discovery of the difference in the legal description, appellant contacted them to inquire what price respondents were asking for ".... that piece of ground back of the wall, there, so he (appellant) could have more parking". It was respondent's testimony that this land was a triangular piece of ground and that this piece of ground represented the footage difference between the Evans Survey and the McClarnon Survey. Appellant denied that this contact relating to purchase ever occurred.

Contrary to respondents testimony, appellant (Griggs) testified, at trial, that respondents had provided the Evans Survey in the fall of 1978 and picked up the Evans Survey in May of 1979. Appellant (Griggs) did not receive the McClarnon Survey until November 1979. In his deposition, Griggs testified that he never received the McClarnon Survey.

Griggs testified that he believed the property within the Evans Survey included all of a ramp located east of the northeast corner of the building. Grigg's wife also testified that she believed appellant had purchased that portion of the property including the ramp.

Griggs testified that respondents did not contact him about the alleged mistake in the deed until May 1980. As regards the ramp, Griggs testified it was open when the lease was signed (June 1978), was closed by

respondent in November 1979, and subsequently re-opened by respondent in April or May of 1980.

Since the trial court made specific findings of fact regarding the ramp to be addressed later in this opinion, additional consideration regarding the evidence about the ramp will be reviewed at this point. For purposes of comparison at trial, the McClarnon Survey was superimposed upon the Evans Survey. The resulting composite revealed the triangular piece of ground. It also revealed the building location and a ramp located east of the northeast corner of the building and shows the building to be 60 feet wide at the north end. There is also a 40 foot parking area east of the building and from the east side of the parking area it is 27 feet to the ramp. The Evans Survey also revealed the ramp to be some 20 feet east of the north end of the building. The McClarnon Survey includes no portion of the land in the vicinity of the ramp or the ramp itself. The Evans Survey reveals only the extreme north end of the ramp.[3]

In contrast to the testimony of appellant-Griggs recited above concerning the status of the ramp, respondents testified the ramp was barricaded at the time the lease was executed (June 1978) and then re-opened in 1980 after a Wal-Mart store had opened in the area.

The evidence further revealed the existence of a concrete retaining wall extending from the northeast corner of the building eastward to the ramp. Prior to the discovery of the discrepancy in the legal description, appellant hired a painter to paint and letter the concrete retaining wall. The painting commenced at the northeast corner area of the building (on the north face of the wall) and continued eastward to a point on the wall coinciding with the east boundary property line, as set forth in the

---

**2.** The record reveals this attorney owned and operated the title company along with his law offices.

**3.** The difference between the surveys arises from the east boundary line. In the Evans Survey, the east line extends northerly at right

angles a distance of 152.73 feet to Highway 69, then veers to the right then due north to Kearney Road. This results in a 100 ft. width line. The McClarnon Survey continuing in a straight line to Kearney Road results in a 51.9 ft. north line.

McClarnon survey. It is, of course, respondent's contention that the termination of the painting on the wall at the boundary line in the McClarnon Survey establishes appellant's acknowledgment of the boundary line. Appellant-Griggs testified to hiring a painter to paint a sign as big as possible for fifty dollars, which the painter did. Griggs also testified that the painting ended at the McClarnon Survey boundary line because money for the signs ran out and there was no relationship between the end of the painting and the boundary line set forth in the McClarnon Survey.

Trial was held and the court entered its findings of fact, conclusions of law and judgment of reformation of the deed. This appeal followed.

Under point (1), appellant presents a bifurcated attack upon the trial court's judgment and charges trial court error in entering judgment for reformation of the deed because (a) reasonable doubt existed as to whether a mistake in the deed occurred, and (b) even if a mistake in the deed occurred, such mistake was not mutual.

In support of (a) above, appellant argues that in its finding of facts and conclusions of law, the court erred because the findings of fact were against the weight of the evidence and because it erroneously applied the law.

The specific findings and conclusions subject to attack are as follows:

Findings of Fact

"11. That on June 7 or 8, 1979, Plaintiff King delivered a copy of the aforesaid McClarnon Survey to Carl L. Griggs, agent for the Defendant.

12. That after the McClarnon Survey was prepared and before the Real Estate Sales Contract was signed, Plaintiff King and his co-owner Plaintiff Jerry L. Short pointed out the boundary lines and surveyor's pins and markings as established by the McClarnon survey of the land to Mr. Griggs.

\* \* \* \* \* \*

18. That at the time of the execution of the aforesaid Contracts, the legal description of the land referred to in the Contracts was affixed thereto and marked as Exhibit A, and was thereby made a part of the Contracts.

20. That the aforesaid Real Estate Sales Contract executed by the parties expressed the agreement and intent of the parties as to the land that was the subject of the oral agreement between the parties.

\* \* \* \* \* \*

26. That at the time the Plaintiffs executed the aforesaid Warranty Deed, they intended to convey as Tract I therein the same land as was set forth in the Real Estate Sales Contract between the parties.

27. That at the time of the delivery and acceptance of the aforesaid Warranty Deed to the Defendant, said Defendant intended to receive as Tract I therein the same land as was set forth in the Real Estate Sales Contract between the parties.

28. That there is a down ramp located to the northeast of the land set forth on the McClarnon survey.

29. That Defendant believed the down ramp was included in the land set forth in the aforesaid Warranty Deed.

30. That, in fact, the down ramp is not included in the land set forth in the aforesaid Warranty Deed.

\* \* \* \* \* \*

36. That Plaintiffs have shown by clear and convincing evidence that a mistake was made that was mutual to both parties in that the legal description set forth in the aforesaid Warranty Deed as Tract I contained more land than as was called for in the legal description attached to the Real Estate Sales Contract between the parties.

37. That Plaintiffs are entitled to equitable relief to reform the legal description to the land set forth as Tract I in the aforesaid Warranty Deed dated July 20, 1979, and recorded in the Office of the Recorder of Deeds for Clay County, Missouri in Book 1368 at page 653."

Conclusions of Law

"2.  The parties entered into a written Real Estate Sales Contract dated June 27, 1979, which had attached thereto an Exhibit A which contained the legal description to the land which was the subject of the aforesaid Contract. This Contract set out the intention and agreement of the parties.

5.  The parties intended that the Warranty Deed convey the land as was described in the Real Estate Sales Contract.

8.  The Warranty Deed therefore did not express the mutual intent of the parties.

11.  The Plaintiffs have shown by clear and convincing evidence that the parties intended to convey certain land in accordance with a previous agreement and by mutual mistake failed to do so.

13.  That Plaintiffs are entitled to equitable relief to reform the legal description to the land set forth as Tract I in the aforesaid Warranty Deed ... by declaring null and void that part of said deed describing land as Tract I therein, and not intended to be conveyed by the parties..."

Aside from citing general case authority including *Feeler v. Gholson,* 71 S.W.2d 727 (Mo.1934); *Snider v. Miller,* 352 S.W.2d 161 (Mo.App.1961) and *LeMehaute v. LeMehaute,* 585 S.W.2d 276 (Mo.App.1979) which declare in combination that reformation is an equitable remedy based upon mutual mistake not going to the subject matter, not easily granted and a remedy requiring clear and convincing evidence as to leave no reasonable doubt either of a mistake or its mutuality; appellant provides this court with little substantive argument on this point. Appellant also directs this court's attention to the rule in *Murphy v. Carron,* 536 S.W.2d 30 (Mo.banc 1976), establishing our four point standard of review. What appellant does not present is the proper perspective of *Murphy. Murphy* does not prohibit this court from making independent findings of fact and conclusions of law, as is our prerogative in the instant case. *Murphy* further announced the *policy* of the courts of this state as to when reviewing courts should make independent findings of fact and conclusions of law, *Urban Expansion Inc. v. Fireman's Fund,* 592 S.W.2d 239 (Mo.App.1980).

As to finding # 11 above, the evidence supports the court's findings that appellant received a copy of the McClarnon Survey. As to finding # 12, the evidence supports the court's findings that respondents and appellant's representative, Griggs, went upon the land and reviewed and discussed the boundaries. The evidence supports the court's finding # 18 that respondents and their counsel testified that Exhibit A (the legal description according to the McClarnon Survey) was attached to the sales contract. In response to that point, appellant merely testified as to having no recollection as to whether it was attached. As to # 20, the evidence supports the court's finding that the sales contract expressed the agreement and the intent of the parties. The evidence reveals respondents wanted to "square their land". Respondents provided appellant with a survey (McClarnon) and the agreement itself specified 50 feet more or less on Kearney Road.

The evidence supports the court's findings # 26 and # 27 in that the parties intended to convey the tract described within the sales agreement. The purchase price was $250,000. Both parties had advice of counsel and the record reveals that counsel was involved in the transaction. The evidence reveals the parties were not under any pressure as to time, financing, or any other cause which would suggest oversight or inadvertence by either party.

As to finding # 28, this court, based upon the evidence in the record, makes its own findings, *Urban Expansion,* supra. Under finding # 28, the trial court did not set forth with sufficient specificity the location of the ramp. The evidence reveals the existence of a down ramp east of the northeast corner of the building, that the building is 60 feet wide at the north end of building, that there is a 40 foot parking area to the east of the building, and that the distance from the east parking lot to the down ramp is 27 feet.

As to finding # 29, this court makes its own independent findings, *Urban Expansion.* The evidence is not sufficient to support the trial court's finding that appellant believed the down ramp was contained in the warranty deed. The only evidence consistent with such finding was the subjective statement of Griggs on behalf of appellant. On direct examination, Griggs testified that he and respondents discussed a 100 foot frontage on Kearney Road and that he thought he was getting that footage. Griggs further testified that by acquiring a 100 foot frontage, he would also acquire a portion of the ramp. He testified further that he and respondents had a conversation subsequent to their real estate transaction concerning the ramp. It was Griggs' testimony that he offered $500 to $1,000 to acquire the remainder of the ramp which was necessary to his business. In contrast, respondent's evidence revealed that while the property was under lease, appellant neither used nor had access to the ramp. The evidence also reveals that the ramp was closed by respondents prior to the execution of the lease. The ramp was barricaded in 1978, by placing 8' × 8' steel beams across the top of the ramp which prevented up and down traffic. The ramp was opened in March 1980. Aside from the foregoing trial testimony of Griggs, there is no evidence appellant ever claimed ownership or control of the ramp or that appellant attempted to make use thereof. There was also controverted evidence by respondents that they had a conversation with Griggs relative to the purchase of additional ground, including the ramp, but that negotiations failed when respondents disclosed an asking price of $35,000.00. The record further reveals that appellant caused the north wall to be painted with a sign advertising its business. This sign ended precisely at the boundary line depicted in the McClarnon Survey and short of the ramp. Appellant explained that he paid a painter $50.00 for a sign and that's where the sign ended. When weighed with other evidence upon this point, it becomes difficult to accept appellant's contention that the boundary line and the painted sign ended coincidentally at the same boundary. At best, pursuant to the Evans Survey, the evidence reveals that appellant would have had only a portion of the ramp. Based upon the record as a whole, this court finds that appellant did not believe the down ramp was in the warranty deed.

As regards finding # 30, # 36, and # 37, the evidence supports the trial court's findings.

As regards the foregoing conclusions of law, this court finds the trial court conclusions to be supported by the record as a whole and that said conclusions were a proper application of the law to the issues herein.

■ The evidence does not support appellant's contention that reasonable doubt existed that a mistake in the deed occurred. There is no merit to part (a), point (1) above and the point is ruled against appellant.

Under part (b) of part (1), appellant offers the alternative argument that if a mistake occurred, it was not mutual. Appellant's argument is mainly a recapitulation of its argument under part (a) point (1) above and no purpose would be served in restating the matters already covered. Appellant contends the trial court made its finding ( # 29 above) that appellant intended to receive the down ramp and then attacks the trial court's finding # 30. To avoid misunderstanding, we reiterate that the evidence supports the trial court in finding # 30. Appellant under this part of point (1) argues that the warranty deed, in fact, contained a portion of the ramp. Conceding this to be the case, perhaps finding # 30 should have so declared in the interest of accuracy. However, appellant misconstrues the clear intent of finding # 30 that the trial court, from *all* the evidence including the warranty deed, found the ramp was not in the warranty deed. Under the evidence, the best appellant could argue is that the warranty deed contained or included only a portion of the ramp. This could not have been the intent of the parties since such a result would not have served their interests. This conclusion is reenforced by

the fact that the description within the deed included only a portion of the ramp at best. In sum, there is no inconsistency in finding # 30.

Appellant correctly refers this court to appropriate authority which declares:

"The party alleging the mistake must show exactly in what it consists, and the correction that should be made. The evidence must be such as to leave no reasonable doubt upon the mind of the court as to either of these points. The mistake must be mutual and common to both parties to the instrument. It must appear that both have done what neither intended... A mutual mistake in a written instrument presupposes a prior or preceding agreement between the parties. To show the mutual mistake in the written instrument the preceding agreement must ex necessitate be shown." *Feeler,* supra pp. 728–729.

Appellant contends that the finding of the trial court upon finding # 29 proves the non-existence of a mutual mistake. That question has been addressed by this court. In conjunction with finding # 29 above, appellant argues that appellant's evidence further supports its intent to have received what is disclosed in the warranty deed. Such a conclusion ignores the evidentiary matters discussed above *and is directly* contrary to the express terms of the pre-existing sales agreement.

Appellant also argues that the evidence supports a finding that appellant intended to receive what it received under the deed in line with the Evans Survey and the pre-existing lease agreement. This aspect of the Evans Survey and its relationship to the legal description in the deed have been discussed previously when we concluded that only a portion of the ramp was included. This fact, in conjunction with evidence concerning appellant's inquiry concerning additional land, the blockage of the ramp and the painting of the sign, renders that portion of appellant's argument meritless. Appellant enlarges its argument to include the contention that it intended to receive the property in connection with the lease and option. Although appellant disagrees, the conclusion is inescapable that the written sales agreement comports with the lease and the lease option. The option in the lease as well as the property description in the lease provide the following:

"The uppermost floor of the building located at 1728 Jesse James Road ... which has dimensions of approximately 60 feet by 135 feet ... together with the parking facilities on the east side of said building for a distance of 40 feet from the east side of said building..."

and the option provided:

"... the sole and exclusive option and right of purchase of the store building leased herein, as well as all of its appurtenances and parking facilities which property is commonly described as 1728 Jesse James Road."

Aside from the claimed intent to receive the property set forth in the deed, there is no challenge by appellant that the legal description within the sales agreement does not conform to the description and terms within the lease.

This court cannot agree with appellant's contention that a mutual mistake did not occur. The first page of the sales agreement references the building as to size (approximately 60' × 100') with frontage on U. S. Highway 69 of 100' and footage on *Kearney Road of 50' more or less.* The sales contract also contained a provision *that the legal description set forth therein would be verified by survey.*

It should be pointed out that under *Feeler,* supra, our state Supreme Court pointed out that reformation requires a showing "by clear and convincing evidence that the land described in the contract was different from that described in the deed". *Feeler,* supra P. 729.

■ There is no merit to appellant's contention in connection with the trial court's finding # 29, or in connection with the lease and the lease option, that no mutual mistake existed. The record reveals that appellant served notice to exercise its option, that a sales agreement was executed

which included a description comporting with the description within the lease, that the sales agreement contained a legal description affixed thereto and that such description was to be verified by survey. From the evidence as a whole, it must be concluded that respondents intended to convey and appellant intended to receive a tract of land containing frontage of 50′ more or less upon Kearney Road. The evidence further supports the conclusion that, by transfer of the property by deed, both parties have done what neither intended. Pt. (1) is found to be without merit and is ruled against appellant.

Appellant's final contention is that even granting a mutual mistake, judgment should not have been entered against appellant because the mistake went to the very subject matter of the contract and deed.

In support of this point, appellant directs this court to *Rainey v. Foland,* 555 S.W.2d 88 (Mo.App.1977) which stands for the following rule:

"However when there is only evidence of a unilateral mistake or a mutual mistake going to the very subject matter of the contract, there has been no meeting of the minds and therefore rescission or cancellation, rather than reformation, is the proper remedy." Id. at 91.

In *Rainey,* the dispute was over a boundary line of property subject to sale and purchase. The language quoted above followed a determination by this court that there was no mutual mistake. We note that the portion of the property in dispute in *Rainey,* was, in fact, owned by the state as a highway right-of-way, and that this information was known to the seller's agent. This court imputed knowledge and the actions of the agent to the sellers and denied equitable relief. What appellant appears to misconstrue is the meaning of the statement, "... or a mistake going to the very subject matter of the contract". *Rainey* was not decided upon that principle, but simply restates it and cites *Frederich v. Union Electric Light and Power Co.,* 336 Mo. 1038, 82 S.W.2d 79 (1935) and *Miller v.*

*Haberman,* 359 Mo. 1012, 224 S.W.2d 1002, 1006 (1949). Those cases are clearly distinguishable. *Frederich* was an action for specific performance of a contract where a finding of a unilateral mistake was made and reformation denied. *Miller* originated as a suit in ejectment with a multiple defense advanced which included reformation of the deeds. The parties had transacted property, which unknown to either party, contained improvements. In *Miller,* there was *no* mistake in the written deed instruments. The language in *Miller* relevant to the instant case is, "*The rule precluding* the consideration of *extrinsic evidence of the intention of the parties* to a deed as stated in the case of *Rummerfield v. Mason,* supra [4] *is not applicable* in the instant case *wherein relief is sought on the ground of mistake.*" *Miller* at 1005 (emphasis added).

*Rumerfield,* cited in *Miller,* announced the rule that the intent of the parties must be gathered from the language of the instrument aided by surrounding circumstances and be interpreted by what the parties have said in the instrument, *not by what they intended to say.* In *Miller,* objection was taken to parol evidence concerning the deed.

*Rainey,* must be observed in its proper context. It dealt with property not owned by the sellers/grantors and, of course, could not be part of any conveyance to the buyers/grantees. Respondents argue and this court agrees that *Rainey* deals with a mutual mistake of the parties as to an extrinsic matter, to wit, property not owned by the seller/grantor. Such interpretation comports with the decision reached in *Rainey,* as well as the general rule that "... reformation will not be allowed for a mistake as to an extrinsic fact which if known would probably have caused the parties to make a different contract". 76 C.J.S. § 26, p. 353, Reformation of Instruments. Thus, if the mistake "... is not in the contract or in the writing embodying the contract but is of an extrinsic fact which, if known, would probably have caused the parties to make a dif-

4. 352 Mo. 865, 179 S.W.2d 732.

ferent contract, reformation will not be allowed." *C.J.S.* While *Rainey* repeats a sound principle of law, it finds no application to the instant case because the mutual mistake herein was within the "writing embodying the contract", to wit, the deed.

Respondent further meets appellant's contention by offering the rule that the mistake of a scrivener although it is a mistake of law in drawing up an instrument whereby he fails to carry out the previous agreement of the parties, may be corrected. It is immaterial who employed the scrivener as agent. *Smith v. Smith,* 289 Mo. 405, 233 S.W. 183 (Mo.1921); *Hoppe v. Boerger,* 116 S.W.2d 195 (Mo.App.1938); *Blevins v. Thompson,* 255 S.W.2d 787 (Mo.1953). The evidence herein was uncontroverted that the title company made a mistake in the description of the deed. Witnesses from the title company testified on behalf of respondents. Richard Moore, an officer of the title company, stated that the description within the sales agreement did not agree with the description in the warranty deed. Mrs. Garvin of the title company stated respondents brought in the McClarnon Survey June 28, 1979. She also testified that the description of the property in the preliminary title report and all other documents including the warranty deed were "mistakenly taken from the old (Evans) survey".

■ There is no merit to appellant's contention that the trial court erred in entering judgment based on a mutual mistake which went to the very subject matter of the contract, because in the instant case, the mistake was within the deed and did not rest upon an extrinsic fact, *Rainey.* This is reenforced by uncontested evidence of a scrivener's error.

■ In conclusion, the record reveals the parties were originally lessor/lessees. There was within the lease an option to purchase and appellant as lessee exercised that option. No legal description was contained in the lease. In contemplation of the sale and purchase, the parties entered into a sales agreement which provided for the purchase of the property for $250,000, set forth

the legal description and to which the parties further agreed there would be verification of the legal description of the property by survey. Under this written agreement, the parties derived and affixed the terms of sale. The description within the sales agreement comported with the description in the lease agreement. The evidence discloses that the scrivener of the deed mistakenly entered the incorrect legal description of the property sold, contrary to the intention of the parties. The record discloses actions by appellant inconsistent with a claim of ownership of the disputed portion of the land, in spite of contrary expressions of intent at trial. The contention by appellant upon trial that there was no mistake in the legal description within the deed and that appellant received the land it intended to receive does not prevent reformation where it appears mutual mistake is present. 66 Am.Jur. § 23 Reformation of Instruments p. 551–552. "By the statement that the mistake must be mutual is *not meant that both parties must agree at the hearing that the mistake was in fact made, but that the evidence of the mutuality must relate to the time of the execution of the instrument* and show that the parties then intended to say one thing and by mistake expressed another and different thing."

Point (2) is found to be without merit and is ruled against appellant.

The judgment is affirmed.

KENNEDY, J., concurs in result.

CLARK, J., dissents.

CLARK, Presiding Judge, dissenting.

I respectfully dissent from the majority opinion and would reverse the judgment of the trial court for the reasons which follow.

Respondents' pleaded claim for reformation of deed was based on the allegation that the deed description was in error through mistake of the scrivener, acting at the time as agent for buyer and seller, resulting in a conveyance of land not intended by either party. The trial court did not find the scrivener to have been the

agent of the buyer and did not find the mistake in property description to have been mutually shared. The decree ordering reformation is therefore an erroneous application of the law and should be reversed.

To perceive the nature of the dispute and the significance of the proof, the unusual configuration of the tract in question must be described. The property is abutted front and rear by two streets, Kearney Road to the north and U. S. Highway 69 to the south. The latter road converges on Kearney as it proceeds in a northeasterly direction with the consequence that side lot lines of this tract must deviate from straight lines at midpoints if equal frontage is to result on each street.

Prior to the conveyance at issue here, the boundaries of the tract had been described by metes and bounds and were more particularly set out in a survey prepared July 15, 1964. That survey is identified as the "Evans Survey." The tract is there depicted generally in the following dimensions:

In June 1978, appellant entered into a lease of "the uppermost floor" of a store building located on the subject property together with parking facilities.[1] The approximate location of the building is indicated by the dotted lines on the diagram above. Access to the leased area is from Highway 69 with which the "uppermost floor" is at grade level. The lower floor is at grade with Kearney Road on the north and was separately leased to another tenant under terms not described. A retaining wall connects to the northeast corner of the building and beyond the wall a concrete ramp provides a route for vehicles along the easterly portion of the property allowing descent from the Highway 69 level to the Kearney Road level. Some portion, if not

1. The lessor is identified in the document as King's Maid Rite, Inc. for which Clifford E. King signed as president and Margaret M. King signed as secretary. The relationship between these parties and respondents is not explained but is immaterial because respondents acknowledge the obligations of the lease devolving upon them as successors in title.

all, of the concrete ramp is located on the property described in the Evans Survey and was included in the deed to appellants.[2]

Appellant's lease from respondents' predecessor in title granted appellant the option to purchase "the store building * * * as well as all of its appurtenances and parking facilities." No further description was supplied. It is, however, undisputed that the option covered the entire building, both the upper area appellant had rented and the lower level, as well as the parking and frontages on Highway 69 and Kearney Road. It is also undisputed that the later purchase was accomplished by the exercise of that purchase option. The Evans Survey showing 100 feet of frontage on both streets was the only survey in existence when the lease was made and its content was known to appellant and respondents.

According to the testimony of respondent Lawrence W. King, when appellant gave notice of its intent to exercise the purchase option contained in the lease, King decided upon "squaring up" other property he owned adjoining the subject property on the east. This he proposed to accomplish by altering the east line of the subject tract to a straight line generally running at a right angle from Highway 69. To obtain a description for the reduced tract, King ordered a new survey referred to as the "McClarnon Survey." The tract thus defined is depicted as follows:

The result of the "squaring up" was to reduce substantially the parking area and street exposure of the lower level storeroom and to place the concrete ramp well beyond

**2.** Inexplicably, the trial court expressly found that the "down ramp" was not included in the deed respondents sought to have reformed. All the witnesses agreed at least a portion of the ramp was conveyed by the deed and the effect of the deed upon access to the ramp was an important point of contention. The majority opinion accepts as correct the finding by the trial court that the ramp was not included in the deed description although that finding is supported by no evidence and is contrary to the weight of the evidence.

the east boundary of the property purchased by appellant. Of primary importance to appellant, as its witnesses testified, was that separation of its land from the ramp would offer the prospect of closing the ramp thereby preventing passage of traffic from the Highway 69 level to the Kearney Road level. Appellant and its customers would then have no exterior route for travel from one level of the store building to the other except by going around the block.

As noted above, the Evans Survey and the lease containing the purchase option constituted the documentation in existence when appellant notified respondents of intent to buy the property. The agreement was thereafter formalized in a real estate sale contract which did not contain, in the body of the contract, a legal description of the tract sold. That description was by attachment and the evidence was in dispute as to whether the new description derived from the recent McClarnon Survey was in fact attached. It was, however, unquestioned that the decision by respondent King to enlarge his own property adjoining on the east by "squaring up" came after appellant gave notice of its intention to exercise the purchase option. Because respondent King supplied the Evans Survey used by the scrivener to draw the deed and the alleged mistake was attributable to no act or omission of appellant who had no contact with the scrivener, the understanding by appellant as to the content of the tract being purchased was critical to respondents' claim of mutual mistake.

The principals of appellant corporation, Vera Griggs and Carl Griggs, testified as to their understanding that the tract optioned in the 1978 lease and the tract purchased was that described in the Evans Survey. They were also of the opinion that the ramp was included therein and in the deed. Again, the evidence was plain that one characteristic of the description in the Ev-

ans Survey was that it included at least part of the ramp while the McClarnon survey did not.[3] In this context, the following finding by the trial court assumes particular significance.

"29. That Defendant [appellant here] believed the down ramp was included in the land set forth in the aforesaid Warranty Deed."

Patently, if appellant believed the ramp was within the boundary of the tract purchased, the description to be used was that of the Evans Survey and there was no mutual mistake in the use of that description in place of the description supplied by the McClarnon Survey. This finding of fact precludes, as a matter of law, the granting of reformation as the judgment awarded.

The majority recognizes this fatal error in the judgment by the trial court, but seeks to remedy the defect, ostensibly on the authority of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), by the simple expedient of making a contrary finding on this fact. This is accomplished by a de novo review of the evidence and a finding that the weight of that evidence persuades this court to conclude appellant did not believe the down ramp "was in the warranty deed."

One of the fundamental precepts of *Murphy v. Carron, supra* is that de novo review of the evidence in a court tried case is no longer permitted by the appellate court. The weight of the evidence is not a matter of concern to the appellate court unless the trial court has reached the wrong result. If the trial court in the exercise of caution entertains a firm belief that the judgment is wrong, it may reverse that judgment by concluding that the findings of fact are against the weight of the evidence. *Heinze v. Hobson*, 622 S.W.2d 17 (Mo.App.1981). There is, however, no warrant under *Murphy v. Carron, supra* entitling the appellate court to reweigh the evidence and alter the findings of fact for the purpose of affirming the judgment nisi. Such a practice

**3.** Neither survey depicted the ramp and its location cannot, therefore, be determined accurately from the exhibits. The inclusion of the ramp in the description taken from the Evans Survey is derived from the testimony of witnesses who made their marks on the exhibits.

would reinstate appellate de novo review and would pose, as here, an insoluble dilemma for the appellant who accepts the findings of fact but complains that the trial court has erroneously applied the law.

An action for reformation based on mutual mistake requires the petitioner to allege and prove a pre-existing agreement between the parties, a mistake and the mutuality of the mistake. *Tripp v. Harryman,* 613 S.W.2d 943 (Mo.App.1981). To show mutual mistake in a written instrument, the preceding agreement must ex necessitate be shown. *Edwards v. Zahner,* 395 S.W.2d 185, 190 (Mo.1965). The precise words of agreement between the parties need not be shown but the evidence must disclose the object upon which the parties were agreed and the fact that the instrument, by a mistake common to both parties, did not satisfy the objective. *Williams v. United Insurance Company of America,* 618 S.W.2d 229, 231 (Mo.App.1981). The power of a court to reform an instrument is an extraordinary one and must be guarded with zealous care and exercised with great caution. *Stein v. Stein Egg & Poultry Co.,* 606 S.W.2d 203, 205 (Mo.App.1980). Mutuality of mistake as a ground for reformation of an instrument must be shown by clear and convincing evidence. *Rainey v. Foland,* 555 S.W.2d 88, 91 (Mo.App.1977).

Appellant charges here that the proof offered by respondents did not show mutuality of a mistake embodied in the deed of conveyance and that the judgment decreeing reformation was therefore an erroneous application of the law. While the evidence recounted above falls far short, in its own right, of clear and convincing proof that a mutual mistake was shared by appellant and respondent and that the deed conveyed land intended by neither as the subject of the sale, the question is more readily resolved. The trial court by its finding 29 expressly concluded that appellant was not mistaken and indeed received conveyance of the land contemplated by it for purchase when the option was exercised. That finding is entitled on appeal to deference if it is supported by substantial evidence.

The judgment reached by the trial court is the result of an incorrect application of the law to the facts. It is not an appropriate function of appellate review to revise the findings of fact for the purpose of conforming them to the result accomplished by the judgment. Respondents should have been denied reformation of the deed because they failed to prove by clear and convincing evidence that the alleged mistake in land description was of mutual origin in buyer and seller. The description used was furnished to the scrivener by respondents, there was no demonstrated contact at all between appellant and the scrivener and substantial evidence supports the finding by the trial court that appellant received conveyance of the land they understood to be the subject of the purchase.

I would reverse the judgment of the trial court and enter judgment for appellant.