**C. Ed GAINES, Appellant,**

v.

**C. W. JONES, et al., Appellees.**

**No. 73–1090.**

Unted States Court of Appeals, Eighth Circuit.

Submitted Sept. 11, 1973.

Decided Oct. 18, 1973.

Rehearing Denied Nov. 8, 1973.

Charles W. Medley, Farmington, Mo., for appellant.

Harry P. Thomson, Jr., Kansas City, Mo., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and ROSS, Circuit Judges.

LAY, Circuit Judge.

Under the terms of a written contract the plaintiff, C. Ed Gaines, was employed from October 1, 1969, to December 31, 1971, by the defendants C. W. Jones and C. W. Jones and Jones Investment Company d/b/a Summit Homes and Jomaco, Inc. Gaines' services were terminated on May 15, 1970, and he subsequently sought damages for the alleged breach of contract by the defendants. The contract contained a liquidated damages clause that required the defendants to pay plaintiff $75,000 in the event Gaines was discharged within the first year.

The trial was held, with jury waived, before the district court, the Honorable John W. Oliver presiding. The court held in favor of the defendants on alternative grounds. The district court found that plaintiff had failed to prove performance, that defendants had been induced to sign the contract through fraudulent misrepresentations, and that the liquidated damages clause of the contract was unenforceable as a penalty clause. Alternatively, the trial court found that the contract was void because of a mutual mistake of fact as to what duties plaintiff was to perform under the contract. We find that the district court ruling was clearly erroneous.

Defendants owned approximately 100 acres of land in Independence, Missouri, which they wished to develop. Defendant Jones contacted his tax attorney, Sylvanus Felix, to discuss an apartment project for the land. Among other things, Felix recommended to Jones that he consider conventional rather than FHA financing because conventional financing would provide a higher per acre value for the land. In response to Jones' request, Felix also recommended Gaines as a suitable person to manage the real estate operation so that Jones would be free to pursue more leisure activities. Felix had the following to say of plaintiff:

> "Well, there [is] only one person that I [know] that could possibly fit into your category. I don't know *whether he is what you would want or not* and this one person is a very close friend of mine. I've known him for many years and he's *only been in the real estate business possibly eight or nine years*. He was head of his own big printing company, up until 1960 when he got into financial difficulties

and had to give up his company and lose it, and sometime after that, why, he went into the—went into the real estate business.

"He has considerable experience in all phases of real estate activities, including sub-dividing and selling land, building houses and has assisted and worked on apartment houses and these John Hancock loans.

"*But there are a lot of things that he would have to have guidance in*, but if you want a man that you can take, he might be interested in coming with you. It would have to be some sort of an incentive arrangement." (Our emphasis).

Subsequently, the parties met to work out the terms of the contract. Plaintiff commenced working for defendants on October 1, 1969, although the contract was not actually signed until December 7, 1969.

Plaintiff's duties under the contract drawn by Jones and his attorney were specifically written out as follows:

"GAINES shall render the following services to JONES, SUMMIT, JOMACO, and GLENDALE DEVELOPMENT CO.:

(1) Assist in evaluating and negotiating purchase of income and/or non-income improved and/or unimproved real properties.

(2) Negotiate and handle sales of properties presently owned, or hereafter acquired by any of them, subject only to advance approval of the price, terms and conditions of sale.

(3) As directed, handle and supervise subdivision development of presently owned unimproved real properties and those acquired in the future.

(4) Generally oversee all construction.

(5) Generally supervise the renting of all apartments constructed by Glendale Development Co.

(6) Do all other things directed by them relating to the duties set forth above."

It is undisputed that plaintiff's duties included the handling of financing for the apartment project. However, the rub came when Gaines was not successful in his attempts to secure financing. Defendants assert that it became evident that Gaines was not competent to handle loan negotiations for a multi-million dollar project and generally failed in his performance. Gaines, however, contends he did everything that was ever requested of him and that he performed under the contract as written.

■ Defendants did not offer any evidence. They insist that plaintiff simply failed to make out a prima facie case. We must disagree. Under Missouri law plaintiff must prove only that he substantially performed his part of the contract up to the time he was prevented from doing so by defendants. At this point the burden shifts to the employer to show that the discharge was for good cause. Meyer v. Weber, 233 Mo.App. 832, 109 S.W.2d 702, 706–707 (1937).[1]

The trial judge made findings of fact and on this basis determined that plaintiff did not in fact perform his contract and that he was unable to perform the duties contemplated by the parties. We are thus dealing with the question of whether the trial judge's findings are clearly erroneous. See United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

---

1. The Missouri courts have drawn a distinction between cases involving an employment contract for a definite term and those having no definite term. Only in the former is the burden of proving justification on the employer. See, e. g., Tolliver v. Standard Oil Co., 431 S.W.2d 159 (Mo.1968); Maddock v. Lewis, 386 S.W.2d 406 (Mo.), cert. denied, 381 U.S. 929, 85 S.Ct. 1569, 14 L.Ed.2d 688 (1965); Johnson v. Thompson, 251 S.W.2d 645, 649 (Mo.1952); Craig v. Thompson, 244 S.W.2d 37, 42 (Mo.1951). The present case involves a contract for a definite term, so that defendant bears the burden of establishing justification.

■ Upon review of the record we conclude that the evidence does not support the trial judge's conclusion that plaintiff failed to perform under the terms of the contract. On the contrary, the evidence demonstrates substantial performance and that the defendants have failed to come forward with any evidence of justification for discharge.

■ We think it well settled law that performance under a personal service contract requires only that a party perform in a good and workmanlike manner, and unless an employee has expressly agreed to secure particular results, the results of his performance are not material. This was the early announced doctrine in Missouri and has generally been followed elsewhere. See, e. g., Middendorf v. Schreiber, 150 Mo.App. 536, 131 S.W. 122, 123 (1910); Dallas Hotel Co. v. Lackey, 203 S.W.2d 557, 562 (Tex.App.1947); Morris v. Muller, 113 N.J.L. 46, 172 A. 63, 64–65 (N.J.Ct. App.1934); 56 C.J.S. Master & Servant § 69 (1948). In Middendorf v. Schreiber, supra, plaintiff was hired by defendant to serve as a jockey for a term of three years. Early in the second year, plaintiff was fired. The defendant attempted to justify the discharge on the basis that plaintiff had turned out to be an incompetent jockey, primarily because he did not win any races. The court held for plaintiff, reasoning that although plaintiff had contracted to perform in a good and workmanlike manner, he did not necessarily warrant that he would win or that he possessed extraordinary skill. It was sufficient that he "possessed and exercised that degree of skill, knowledge, and ability as a jockey which is usually attained and employed by other jockeys." *Id.* at 123 of 131 S.W. His obligation, unless the contract had expressly required more, was "to be determined by reference to the manner in which other ordinarily skillful jockeys performed the same service." *Id.*

In concluding that Gaines failed to perform, the district court found, *inter alia,* that plaintiff's duties under the contract included arranging for a multi-million dollar loan for the apartment project; that plaintiff only contacted two financial institutions in his attempts to secure financing; that plaintiff never attempted to secure FHA financing; that plaintiff had no *written* communications with any financial institutions; that plaintiff never made an accurate cost estimate of the project to be submitted to potential lenders; that plaintiff had no prior experience with large apartment developments; and that plaintiff had never before negotiated multi-million dollar loans.

As we view the entire record, we cannot agree that these findings established plaintiff's failure and inability to perform. First, the written contract spells out the obligations of the parties, and although plaintiff orally understood he would work on the financing arrangements for the apartment project, the contract itself is silent as to this being a specific duty. More important, the contract clearly does not require success in obtaining such financing.

Second, there is no evidence that Jones expected plaintiff to exhaust all possible sources in his attempts to secure financing. Plaintiff contacted two companies and felt it was against defendants' interest to engage in further "loan shopping."

Third, the undisputed evidence is that plaintiff did not seek FHA financing because defendant directed him not to do so.[2]

The evidence shows that defendants were interested only in a "John Hancock" loan wherein a sale and leaseback arrangement was involved.

Fourth, Jones himself admitted that it was not his custom to make formal written applications for loans. He would "go down and talk to them."

---

2. Jones ultimately obtained an FHA loan. Jones had earlier told Gaines that he hoped to get $30,000 to $40,000 an acre for his land, which was not possible under an FHA loan.

This plaintiff did with two financial institutions. In addition, the evidence is that plaintiff mailed plans to the Glen Justice Mortgage Company and met with representatives of the Charles Curry Company on several occasions. Plaintiff obtained bids from subcontractors and attempted cost estimates by getting a cost per square foot estimate. There is no testimony which demonstrates this was improper performance.

Fifth, plaintiff's past job experience was accurately represented. He never represented that he had previously negotiated multi-million dollar loans or that he had experience with large apartment complexes. On the other hand, there was evidence that his experience included the development of Southern Oaks, a 300 home-site project in Oklahoma City and Oak Cliff, a housing project of approximately 200 lots. Plaintiff had also previously operated a house building company and a real estate sales company. Plaintiff had prior experience with FHA and John Hancock loans.

Finally, we note that although plaintiff began working for defendants on October 1, 1969, the contract was not signed until December 7, 1969. Defendants thus had ample opportunity to observe plaintiff's performance before entering into the contract. At no time is specific complaint made or evidence adduced as to plaintiff not performing as required; in fact the only evidence along this line is that plaintiff was unable to successfully secure conventional financing for the apartment project. His failure to obtain a loan commitment was not shown to be from lack of diligence or effort. He explained that the mortgage market was "drying up" and had "gone completely down." According to plaintiff, Jones at one point told him: "Don't worry about it. If we don't do it this six months we will do it next year. There is no problem."

In sum, the record clearly establishes the terms of the contract and plaintiff's performance under it. Under these circumstances, we hold the trial court's findings to be clearly erroneous.

## Fraudulent Inducement

It is undisputed that Gaines was not present at the time Felix, Jones' attorney, first told Jones about plaintiff. Nor is there any evidence that Gaines ever learned what Felix said to Jones. It is difficult to understand how Gaines can be held responsible for Felix's alleged misrepresentations when there is no evidence that Gaines knew what was said or in any way ratified Felix's statements. Moreover, we find that Felix's statements to Jones were not false. Furthermore, the record adequately demonstrates that Jones was sufficiently alerted when Felix added:

> "But there are a lot of things that he would have to have guidance in, but if you want a man that you can take, he might be interested in coming with you." (Our emphasis).

The finding of fraudulent inducement is simply not supported by the record.

## Mutual Mistake of Fact

The trial court alternatively held the contract void because of a mutual mistake of fact as to the duties the parties contemplated would be performed by Gaines, as General Manager, under the contract. The trial court concluded that Jones expected Gaines to carry out all but the highest executive responsibilities whereas it assessed Gaines' testimony as meaning that Gaines thought he was to perform only those duties Jones assigned to him. There is no evidence to support this finding. Plaintiff testified that he understood Jones "wanted a general manager, somebody to run his full real estate operation in the sales and the development of this balance of land that he had." If Jones contemplated that Gaines' obligation was to be successful in obtaining a conventional loan for the project, this must be viewed as a unilateral mistake by Jones, not in any manner induced by Gaines. Absent exceptional circumstances, a unilateral misunderstanding, not induced by a party to the contract, will not afford relief for recission. See, e. g., Saline County v. Thorp, 337 Mo. 1140, 88 S.W.2d 183,

185 (1935); Frederich v. Union Electric Light & Power Co., 336 Mo. 1038, 82 S.W.2d 79, 86 (1935); Law Reporting Co. v. Whitaker, 254 S.W. 715, 716 (Mo. App.1923).

### Liquidated Damages

The contract provided that in the event Gaines was discharged prior to December 1, 1970, he was to receive $75,000. The trial court found that this clause called for "damages grossly in excess of those actually suffered by the plaintiff and therefore said clause must be considered as a penalty and therefore unenforceable."

██ We find this analysis reflects an erroneous application of the law governing liquidated damages. The intention of the parties *at the time the contract is executed* is determinative of whether a clause is or is not a penalty. In Southwest Engineering Co. v. United States, 341 F.2d 998 (8th Cir.), cert. denied, 382 U.S. 819, 86 S.Ct. 45, 15 L.Ed.2d 66 (1965), this court made the following observation on liquidated damages clauses:

> "Two requirements must be considered to determine whether the provision included in the contract fixing the amount of damages payable on breach will be interpreted as an enforceable liquidated damage clause rather than an unenforceable penalty clause: *First, the amount so fixed must be a reasonable forecast of just compensation for the harm that is caused by the breach, and second, the harm that is caused by the breach must be one that is incapable or very difficult of accurate estimation. . . .*

> "*Whether these requirements have been complied with must be viewed as of the time the contract was executed rather than when the contract was breached or at some other subsequent time.* Courts presently look with candor upon provisions that are deliberately entered into between parties and therefore do not look with disfavor upon liquidated damage stipulations." *Id.* at 1001. (Our emphasis).

At the time the present contract was executed, it clearly met the two requirements noted above. Had plaintiff continued to work for defendant, he could reasonably have expected to earn substantial sums under the provision of the contract which provided for plaintiff to receive ten per cent of any profits derived from land sales. Defendant told plaintiff that he could expect at least $50,000 to $60,000 in the first year, provided a John Hancock loan was obtained. Thus, the liquidated damages clause seems to have been a reasonable forecast of the harm plaintiff could expect if he was discharged prior to sharing in the profits.

Plaintiff's situation also meets the second requirement in that before any profits were realized, no more than a rough estimate of plaintiff's loss could be made.

Defendant urges that the test under Missouri law is that the amount agreed upon must not be out of proportion to the damages *actually* suffered, citing Franken v. Carpenter, 364 S.W.2d 15 (Mo.App.1963). See also Buchanan v. Louisiana Purchase Exposition Co., 245 Mo. 337, 149 S.W. 26, 29–30 (1912); cf. Christopher & Simpson Architectural Iron & Foundry Co. v. E. A. Steininger Const. Co., 200 Mo.App. 33, 205 S.W. 278, 285 (1918). Defendant argues that $75,000 was grossly in excess of plaintiff's *actual* damages because plaintiff did not suffer any actual damages. His moving expenses to and from Independence were paid and he resumed his old job as soon as he returned to Oklahoma City. However, this employment was at a much lower salary.

In *Southwest Engineering,* supra, this court cited numerous cases discussing whether or not actual damages need be suffered. We observed:

> "In United States v. J. D. Streett & Co., E.D.Mo., 151 F.Supp. 469, 472, Judge Harper, in upholding a claim for liquidated damages, states:

> 'Although it is clear that a finding that a provision is one for liquidated damages requires that damages

could be anticipated at the time of execution of the contract, *whether actual damage did or did not occur or was not proved to have occurred does not prevent recovery.'*

We affirmed upon appeal. J. D. Streett & Co. v. United States, 8 Cir., 256 F.2d 557.

"The late Judge Goodrich in United States v. Le Roy Dyal Co., supra, in a well-considered opinion dealing with numerous aspects of the liquidated damage issue, states:

'If a provision for liquidated damages is upheld *the fact that actual damage did or did not occur or was not proved to have occurred does not prevent the recovery of the stipulated sum.* There is some dissent on this point, but the statement just made represents the great weight of decided cases.' [3 Cir.] 186 F.2d 460, 462.

.   .   .   .   .   .

"*We believe that the cases holding that the situation existing at the time of the contract is controlling in determining the reasonableness of liquidated damages are based upon sound reasoning and represent the weight of authority.* Where parties have by their contract agreed upon a liquidated damage provision as a reasonable forecast of just compensation for breach of contract and damages are difficult to estimate accurately, such provision should be enforced. If in the course of subsequent developments, damages prove to be greater than those stipulated, the party entitled to damages is bound by the liquidated damage agreement. It is not unfair to hold the contractor performing the work to such agreement if by reason of later developments damages prove to be less or non-existent. Each party by entering into such contractual provision took a calculated risk and is bound by reasonable contractual provisions pertaining to liquidated damages." Id. at 1002–1003 of 341 F.2d. (Our emphasis).

We find Missouri law supports this rationale. See Wilt v. Waterfield, 273 S.W.2d 290 (Mo.1954); Yerxa, Andrews & Thurston, Inc. v. Randazzo Macaroni Mfg. Co., 315 Mo. 927, 288 S.W. 20 (1926). In Manufacturers Casualty Ins. Co. v. Sho-Me Power Corp., 157 F.Supp. 681 (W.D.Mo.1957), the district court in applying Missouri law observed:

"When the damages are uncertain in nature or amount or are difficult of ascertainment and the amount agreed on is not extravagant and unreasonably disproportionate to the damages that actually resulted from a breach of contract, the contract provision is upheld." Id. at 683.

But then added:

"Of course there can be no question of the right of parties to a contract to agree among themselves what the damages should be in the event of a breach. See the old case of Morse v. Rathbun, 42 Mo. 594, with its many subsequent citations. Hence, in determining whether a provision in a contract provides for a penalty or liquidated damages the intention of the parties in each case, measured from the time the contract was executed and not from hindsight after the performance is completed, is the test to be applied." Id. at 684.

The early Missouri cases are discussed in *Yerxa,* supra at 33 of 288 S.W., where the court said:

"The question is one to be determined by the contract, fairly construed, and, in arriving at a determination, the courts will seek to arrive at the intention of the parties from a consideration of the contract as a whole, the situation of the parties, the subject-matter of the contract, and all the circumstances surrounding its execution, together with the ease or difficulty of measuring the breach in damages, and the magnitude of the stipulated sum, not only as compared with the value of the subject of the contract, but in proportion to the *probable* consequence of the breach." (Our emphasis).

In May v. Crawford, 150 Mo. 504, 51 S.W. 693, 701 (1899), the court commented that one of the tests was:

"[A]nd the amount stipulated in the contract as the damages to be recovered is not 'disproportionate to the *probable* damage,' the courts will construe it to be liquidated damages." (Our emphasis).

In Stein v. Bruce, 366 S.W.2d 732, 736 (Mo.App.1963), the Kansas City Court of Appeals observed:

"[I]t will be our duty to hold that the stipulated sum is for liquidated damages *unless we determine it to be unreasonable in amount as a forecast of probable damages and disproportionate to the amount of damages that could probably result from the breach.*" (Emphasis in original).

Williston observes:

"Although the mere fact that, as it turns out, the sum named exceeds the actual damage will not make it a penalty, since the reasonableness of the provision must be considered as of the date of the contract, yet the excessive size of the sum agreed upon may tend to show that the parties did not make a bona fide effort to fix the actual value of the injury." 5 Williston on Contracts § 783, at 725–726 (3d Ed. 1961).

The Restatement of Contracts § 339, Comment (c) recites:

"Where the amount of loss or harm that has been caused by a breach is uncertain and difficult of estimation in money, experience has shown that the estimate of a court or jury is no more likely to be exact compensation than is the advance estimate of the parties themselves. Further, the enforcement of such agreements saves the time of courts, juries, parties, and witnesses and reduces the expense of litigation. In such cases, if it is not shown that the principle of compensation has been disregarded, the liquidation by the parties is made effective."

 We are, of course, required to follow Missouri law. Where uncertainty exists as to state law, consideration must be given to the rule which we believe the state court would in all probability follow under the facts presented. To measure the reasonableness of a liquidated damages stipulation by proof of the actual amount of damages incurred invokes hindsight judgment guided by events that actually occurred rather than by the intention of the parties at the time the contract was executed as to what the probable damages might be. Thus, we feel the early pronouncement of the Missouri Supreme Court that the reasonableness of damages should be measured by the probable estimate of such damage at the time of executing the contract should be the controlling principle. This is the principle adhered to by this court in *Southwest Engineering*, supra, and the proper rule we find applicable here. In light of this discussion, we find the sum of $75,000 not unreasonable. The clause is not a penalty and is enforceable.

Judgment reversed and remanded with directions to enter judgment for plaintiff in the sum of $75,000 and costs.