The GREAT WESTERN SUGAR COMPANY, Appellee,

v.

MRS. ALISON'S COOKIE COMPANY, INC., Appellant.

The GREAT WESTERN SUGAR COMPANY, Appellee,

v.

ST. LOUIS BAKERS' CO–OPERATIVE ASSOCIATION, a Missouri corporation, Appellant.

The GREAT WESTERN SUGAR COMPANY, Appellee,

v.

SUGAR DISTRIBUTORS, INC., a Missouri corporation, Appellant.

The GREAT WESTERN SUGAR COMPANY, Appellee,

v.

HALBEN FOOD MFG. CO., INC., Appellant.

The GREAT WESTERN SUGAR COMPANY, Cross-Appellant,

v.

MRS. ALISON'S COOKIE COMPANY, INC., Cross-Appellee.

The GREAT WESTERN SUGAR COMPANY, Cross-Appellant,

v.

ST. LOUIS BAKERS' CO–OPERATIVE ASSOCIATION, a Missouri corporation, Cross-Appellee.

The GREAT WESTERN SUGAR COMPANY, Cross-Appellant,

v.

SUGAR DISTRIBUTORS, INC., a Missouri corporation, Cross-Appellee.

The GREAT WESTERN SUGAR
COMPANY, Cross-Appellant,

v.

HALBEN FOOD MFG. CO., INC.,
Cross-Appellee.

The GREAT WESTERN SUGAR
COMPANY, Appellee,

v.

MRS. ALISON'S COOKIE COMPANY,
INC., Appellant.

The GREAT WESTERN SUGAR
COMPANY, Appellee,

v.

ST. LOUIS BAKERS' CO-OPERATIVE
ASSOCIATION, a Missouri
corporation, Appellant.

The GREAT WESTERN SUGAR
COMPANY, Appellee,

v.

SUGAR DISTRIBUTORS, INC., a
Missouri corporation, Appellant.

The GREAT WESTERN SUGAR
COMPANY, Appellee,

v.

HALBEN FOOD MFG. CO.,
INC., Appellant.

Nos. 83–1725, 83–1758 and 83–2055.

United States Court of Appeals,
Eighth Circuit.

Submitted March 12, 1984.

Decided Dec. 5, 1984.

Rehearing Denied in Nos. 83–1725 and
83–1758 Jan. 4, 1984.

**518**

William J. Travis, St. Louis, Mo., for appellant.

Philip E. Morgan, Jr., Union, Mo., for appellee.

Before ROSS, JOHN R. GIBSON and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Plaintiff in this diversity action is The Great Western Sugar Company (Great Western). Great Western is a Delaware corporation in the business of refining and selling beet sugar. Its principal place of business is in Denver. Defendants Mrs. Alison's Cookie Company, Inc., St. Louis Bakers' Co-Operative Association, Sugar Distributors, Inc., and Halben Food Manufacturing Company, Inc. are Missouri corporations based in St. Louis. Great Western sued defendants for breach of certain sales contracts. After a jury trial, judgment was entered in favor of Great Western and Great Western was awarded costs. Defendants appealed and Great Western filed a conditional cross appeal. We affirm in part, reverse in part, and remand the case to the District Court.

**I. Facts**

Each of the defendants had for many years prior to this case purchased Great Western sugar for use in their businesses. Great Western sugar was sold by sales representatives in Great Western's Denver office and by a number of sugar brokers. The brokers handled sales to Great Western's customers located outside the area serviced by the Denver sales representatives. During the relevant time period, Great Western sugar was sold in the St. Louis area exclusively through Harry Talbot, a broker who operated a sugar brokerage known as Sugar Marketing, Inc. Talbot apparently was for many years the only person with whom any of the defendants had direct contact concerning the purchase of Great Western sugar.

Prior to mid-1980, defendants purchased Great Western sugar through Talbot under two purchase formats: the sugar was sold either on a "spot" basis or pursuant to an oral "booking." Spot purchases were one-time orders for sugar to be shipped almost immediately. The price for sugar purchased on a spot basis was the market price as of the day the sugar was ordered. A booking was an oral order for a large quantity of sugar to be shipped in increments over a period of time. Typically, bookings were made on a quarterly (three-month) basis, e.g., during the first quarter of a given year, sugar would be booked for the second quarter of that year. The price of the entire amount of booked sugar to be purchased in a quarter was set at the time of booking. Defendants scheduled delivery of and paid for the booked sugar as the need for it arose throughout the relevant quarter until, at the end of the quarter, they had taken delivery of the entire amount of sugar that had been booked for the quarter. Whether defendants were making a spot purchase or a booking, they placed their orders with Talbot.

In July or August 1980, Great Western discontinued the practice of selling sugar pursuant to oral bookings. Instead, Great Western began using written contracts known as letter agreements for quarterly sugar orders. Under this new arrangement, St. Louis customers still placed their quarterly orders with Talbot. Talbot then communicated the orders to Great Western's Denver office. A given quarterly order included the amount of sugar to be purchased in the upcoming quarter as well as the proposed price at which all of the sugar for the upcoming quarter was to be billed. Providing Great Western accepted an order, a letter agreement incorporating its terms was prepared in the Denver office, signed by Great Western, and forwarded through Talbot to the customer. The customer was to sign its letter agreement and return it to Great Western. The

scheduling of delivery and payment was to be handled in a manner similar to that under the booking arrangement. Spot purchases of sugar still could be made at any time and were handled in a manner that remained essentially unchanged.

Either simultaneously with or shortly prior to Great Western's shift from the use of oral bookings to the use of letter agreements, another sales practice of Great Western was changed. Under the oral booking system, Great Western often had afforded customers including defendants "downside price relief" on their quarterly sugar orders. The possibility of downside price relief was very favorable to customers: if the market price of sugar rose during a quarter for which sugar had been booked, the customer still paid the lower price negotiated at the time of booking, but if the market price of sugar fell during a quarter for which sugar had been booked, the customer could request that the higher price negotiated at the time of booking be reduced to reflect the new, lower market price. Defendants always made arrangements for downside price relief through Talbot. Employees of Great Western testified that with the advent of the letter agreement system, it became company policy not to provide downside price relief. The record fails to establish, however, that Great Western communicated to defendants that there would be no downside price relief under the letter agreement system.

Defendant Mrs. Alison's Cookie Company, Inc. signed a letter agreement with Great Western covering sugar purchases to be made during the fourth quarter of 1980. Additionally, during the fourth quarter of 1980, each of the four defendants signed separate letter agreements with Great Western for various amounts of sugar to be purchased during the first quarter of 1981. The critical dispute in this case involves these 1981 first quarter letter agreements (the contracts).

At the time the contracts were signed, the price of sugar was $47 per hundredweight and was expected to rise. Instead, by December 1980, the market price of sugar had fallen well below $47. In response to the declining market price of sugar, defendants contacted Talbot to discuss the possibility of securing downside relief from the $47 price term in the contracts. Talbot relayed defendants' inquiries to Charles Walton, western regional sales manager of Great Western. Walton responded that he would have to check with his superiors before he could give Talbot an answer.

In preparing to call Talbot with Great Western's response to defendants' request for downside price relief, Walton asked office worker Kathy Kitzman whether or not defendants had signed and returned the contracts. On January 23, 1981, through inadvertance, Kitzman mistakenly told Walton that defendants had not signed and returned the contracts. Actually, the signed contracts were on file in Great Western's office. Later that day, Walton telephoned Talbot. According to the testimony of both Talbot and Kitzman (who was standing next to Walton during this telephone conversation), Walton told Talbot that defendants would be held to the quantity term of the contracts but that they would be relieved of the $47 price term; the price to be applied to each order would be the market price as of the date the order was placed. Talbot noted in his own handwriting on the telex sheet containing the original terms of defendants' contracts that the contract price had been so modified "per phone Chuck Walton." Joint Appendix (J.A.) at 29. This notation also included the date "1–23–81." *Id.* Talbot telephoned defendants within minutes after his conversation with Walton to tell them of the favorable modification.

Walton's only testimony on this point is that he has no recollection of the January 23 phone conversation or of any phone conversation with Talbot concerning price relief for defendants on these contracts. Thus there is nothing from Walton, nor is there any other testimony, to cast doubt upon the evidence given by Talbot and Kitzman.

Defendants began to schedule delivery of sugar very shortly after Talbot told them that the contract price had been modified. Defendants assumed that these deliveries would be credited in fulfillment of their obligations under the 1981 first quarter contracts to purchase certain quantities of sugar. Meanwhile, only a few days after the January 23 phone conversation, Kitzman informed Walton that she had "goofed" and that Great Western indeed had contracts on file signed by each of the defendants.

For two to three weeks Walton did nothing about the situation. Finally, one of Walton's superiors, who suspected something was amiss with defendants' contracts, confronted Walton, reminded him of Great Western's new policy against downside price relief, and told him to let defendants know that they would be held to the original contract terms including the $47 price. Walton then telephoned Talbot and told him that a mistake may have been made and that Talbot should clarify with defendants that they were bound by the original contracts. Talbot refused to do so because he felt that no mistake had been made; Talbot believed that both Walton and he clearly understood that the purpose of their January 23 telephone conversation was to discuss modifying the price term of the contracts and that Walton had communicated approval of such a modification. Following Talbot's refusal to inform defendants of Walton's change of position, Walton telephoned defendants and told them that they had to honor their original contracts.

Defendants refused to comply with Great Western's demands. While each of the defendants did purchase sugar from Great Western during the first quarter of 1981, Mrs. Alison's Cookie Company, Inc., Sugar Distributors, Inc., and Halben Food Manufacturing Company, Inc. did not purchase any sugar at the $47 price. St. Louis Bak-

ers' Co-Operative Association purchased only 2016 of its 5000 hundredweight contract quantity at the $47 price.

Great Western filed separate lawsuits against defendants for breach of their 1981 first quarter contracts. Great Western also sued Mrs. Alison's Cookie Company, Inc. for breach of its 1980 fourth quarter contract. The cases were consolidated. Judgment in favor of Great Western on all five contracts was entered by the District Court following a jury trial and costs were awarded to Great Western.[1]

Defendants argue that the District Court should have granted their motions for a directed verdict or judgment notwithstanding the verdict because (1) the contracts were modified on January 23, 1981 and (2) defendants performed the modified contracts or were performing under them until Great Western anticipatorily repudiated the modified contracts. Defendants additionally claim that the District Court should have granted their motion for a new trial due to error in rulings by the court regarding issues of damages and due to erroneous jury instructions. Finally, defendants dispute the District Court's award of costs to Great Western.

Great Western filed a conditional cross appeal to be considered if this Court does not affirm the judgment of the District Court. In its cross appeal, Great Western also challenges certain rulings of the District Court as to issues of damages and claims error in the District Court's refusal to instruct the jury on the applicability of the statute of frauds to this case.

## II. The 1980 Fourth Quarter Contract

■ At the outset, we note that the issues raised by the parties relate almost exclusively to the 1981 first quarter contracts. Defendant Mrs. Alison's Cookie Company, Inc. makes only a minimal argument for reversal of the judgment against it on its 1980 fourth quarter contract with

1. Great Western recovered $9000 on its 1980 fourth quarter contract with Mrs. Alison's Cookie Company, Inc. On the 1981 first quarter contracts Great Western recovered $60,000 from Mrs. Alison's Cookie Company, Inc., $75,000 from St. Louis Bakers' Co-Operative Association, $250,000 from Sugar Distributors, Inc., and $175,000 from Halben Food Manufacturing Company, Inc. The costs award totaled $12,-822.60. See J.A. at 18–20.

Great Western. We find this portion of the District Court's judgment to be supported by the record and we find no related error of law. Thus we affirm the District Court's judgment against Mrs. Alison's Cookie Company, Inc. on the 1980 fourth quarter contract.

### III. The 1981 First Quarter Contracts

Defendants' ultimate view of this case is that they are entitled as a matter of law to judgment in their favor on the claims relating to the 1981 first quarter contracts because Great Western repudiated the contracts after they had been validly modified. Having reviewed the record and the arguments of the parties, we do not find defendants' position to be established as a matter of law. Therefore we cannot say that defendants should have been granted a directed verdict or judgment notwithstanding the verdict. We do, however, find that defendants are entitled to a new trial because the jury did not have the opportunity to determine under correct instructions whether or not the contracts were modified.

When Walton telephoned Talbot on January 23, 1981, Walton thought that Great Western did not have in its possession 1981 first quarter contracts signed by defendants; Kitzman inadvertently had told Walton that Great Western had not received them when in fact the signed contracts were on file in Great Western's office. Great Western contends that Walton therefore could not have discussed or agreed to a modification of contracts he believed did not exist. The District Court, apparently persuaded by Great Western's reasoning, instructed the jury that

> [i]f you believe at the time of his January 23, 1981 conversation with Harry Talbot, that Chuck Walton believed that there were no contracts between Great Western Sugar and the Defendants because the Defendants had not signed and returned them, you may find that there

was no "meeting of the minds" between the Great Western Sugar Co. and the Defendants regarding their modification. Instruction 19A, J.A. at 21.

Defendants argue that Instruction 19A told the jury that a unilateral mistake of fact on the part of Great Western was reason enough to find that the contracts were not modified and that this was a misstatement of the law. We agree with defendants and hold that the District Court committed reversible error by giving Instruction 19A.

The law is well settled that a contracting party generally may not escape its contractual responsibilities by claiming that it was unilaterally mistaken. *See, e.g., Gaines v. Jones,* 486 F.2d 39, 43 (8th Cir. 1973), *cert. denied,* 415 U.S. 919, 94 S.Ct. 1418, 39 L.Ed.2d 474 (1974) (applying Missouri law). Exceptions to this rule are made, however,

> [w]here the mistake of one party is either known to the other party or is so obvious, under the circumstances, that it must have been known to him, and the mistake concerns a matter so vital that it can be said that the parties, because of miscalculation or false information, never actually agreed to the same proposition.

*Frederich v. Union Electric Light & Power Co.,* 336 Mo. 1038, 82 S.W.2d 79, 86 (1935); *Saline County v. Thorp,* 337 Mo. 1140, 88 S.W.2d 183, 185 (1935).

Walton's mistaken belief that Great Western did not possess contracts signed by defendants was entirely unilateral.[2] Defendants knew that they had signed and returned the contracts and presumed the contracts to be in Great Western's possession, where in fact they were. Moreover, there is no evidence that defendants knew of Walton's mistaken belief nor is there any evidence that defendants must have known of this unilateral mistake. Thus, an exception to the general rule denying relief to a contracting party that claims it was

---

**2.** This is not a case involving a mutual mistake, which is a mistake "common to both contracting parties, wherein each labors under the same misconception as to a past or existing material fact." *Czarnecki v. Phillips Pipe Line Co.,* 524 S.W.2d 153, 157 (Mo.Ct.App.1975).

unilaterally mistaken cannot be made in this case.

We view Walton's mistaken belief as being immaterial. What must be carefully assessed in this case is not the effect of Walton's undisclosed belief but the effect of the January 23 telephone conversation itself. "If [a party's] words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of [the party's] mind on the subject." *Holmes v. Freeman*, 150 S.W.2d 557, 562 (Mo.Ct.App.1941); *Roper v. Clanton*, 258 S.W.2d 283, 288 (Mo.Ct. App.1953). While we decline to say what final effect the telephone conversation should be given, we cannot allow it to be disregarded simply because, at the time the conversation took place, Walton was laboring under a factual misconception that was wholly his own.

■ The District Court's instructions on the issue of unilateral mistake are simply irreconcilable. First the court gave Instruction 19, which told the jury that

> [o]nce an agreement or modification to an agreement is reached between the parties, one of the parties cannot thereafter unilaterally change the terms of such agreement or modification because of such party's mistake or misunderstanding.

J.A. at 21. Instruction 19 arguably can be construed as a statement by the District Court that a contracting party's unilateral mistake generally is not a sufficient reason to excuse that party from its contractual obligations. Such a statement is in agreement with the applicable law which we have outlined *supra* pp. 521–522. Instruction 19, however, was immediately contradicted by Instruction 19A, which told the jury that it could view Walton's unilateral mistake as a sufficient reason to find that there was no modification of the 1981 first quarter contracts. While Instruction 19 may be a correct statement of the general law, it appears almost as boilerplate. We do not believe that the perfunctory

treatment in Instruction 19 of the unilateral mistake issue cures the highly fact-specific and legally incorrect treatment it received in Instruction 19A.

Defendants properly preserved for review the error in Instruction 19A on the issue of mistake by objecting to the instruction in accordance with Fed.R.Civ.P. 51. *See* Trial Transcript (Tr.) at 5–58. We find that Instruction 19A, even when viewed in light of the entire jury charge, *Villanueva v. Leininger*, 707 F.2d 1007, 1009–10 (8th Cir.1983), permitted the jury to reject defendants' claim that the 1981 first quarter contracts were modified solely upon a belief by the jury that Walton was unilaterally mistaken. Instruction 19A thus misstated the law concerning a pivotal issue in the case and thereby may well have led the jury to a verdict it would not otherwise have reached. The potential that this is precisely what occurred is far too significant for this Court to ignore.

Defendants in their appeal and Great Western in its conditional cross appeal have challenged various rulings of the District Court on questions of damages and have challenged the District Court's refusal to give certain requested jury instructions. With respect to these claims, our review of the case discloses no error on the part of the District Court. However, for the benefit of the parties and the court should this case again be brought to trial, we will comment briefly on one aspect of these additional claims.

The District Court identified as crucial questions in this case whether Walton had authority on behalf of Great Western to modify the 1981 first quarter contracts and whether Talbot had authority on behalf of Great Western to communicate such modifications to defendants. *See* March 22, 1983 Order denying defendants' motion for summary judgment and March 24, 1983 Order denying plaintiff's motion for partial summary judgment, J.A. at 16; Tr. at 2–108 to 109, 4–29 to 30. Based upon our reading of the record, we are not convinced that it is important to determine whether Walton had authority to modify contracts

on behalf of Great Western. The evidence indicates that Walton had to check with his superiors before he could respond to Talbot on the question of downside price relief for defendants and that Talbot knew this. *See* Tr. at 3–100. Thus, the appropriate question seems to be not whether Walton had authority to modify the contracts but whether he had authority to communicate assent to modification of the contracts. Furthermore, any inquiry as to Talbot's authority may be unnecessary. Granted, if Talbot was Great Western's agent, one might well ask whether Talbot had authority to communicate to defendants the information he had received from Walton. But if, as Great Western argues, Talbot was defendants' agent, the question would be extraneous; in that case, authorized communication of Great Western's willingness to modify the contracts by Walton to Talbot would have the same effect as such a communication by Walton to defendants themselves.

In any event, the District Court instructed the jury only generally and in a rather abstract way as to agency-related issues, *see* Instruction 20, J.A. at 24, and it rejected defendants' proposed Instructions 29(a) and 29(b), J.A. at 22–23, which addressed such issues in detail. We do not find any error in Instruction 20 itself. Nor do we find that the District Court necessarily should have given the particular instructions proposed by defendants. We nevertheless acknowledge that carefully tailored, specific instructions probably would have been more helpful to the jury in resolving the issues before it than was Instruction 20 alone. Another jury may be called upon to decide this case and agency-related issues may remain for its resolution. In that event, we encourage the District Court to give thorough instructions that will assist the jury in its effort to apply the law to the facts of this case.

## IV. Conclusion

The judgment of the District Court against Mrs. Alison's Cookie Company, Inc. on the 1980 fourth quarter contract is affirmed. The judgment of the District Court against defendants on the 1981 first quarter contracts is reversed and the case is remanded to the District Court for a new trial of the claims related to those contracts. The District Court's award of costs to Great Western is reversed and remanded for a new determination of costs. Should any determination of costs be deemed appropriate at this time, the District Court must now consider that Great Western has prevailed only on its claim against Mrs. Alison's Cookie Company, Inc. under the 1980 fourth quarter contract.